[Cite as *St. Clairsville Pointe, Inc. v. Musilli*, 2022-Ohio-2646.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## BELMONT COUNTY

ST. CLAIRSVILLE POINTE, INC.,
DBA CUMBERLAND POINTE CARE CENTER,

Plaintiff-Appellee,

v.

KRISTI MUSILLI et al.

Defendants-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 BE 0019**

---

Civil Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 17 CV 213

**BEFORE:**
Carol Ann Robb, Gene Donofrio, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed in part; Modified in part.

---

*Atty. Thomas P. Semple*, Semple & Eicher Co., L.P.A., One Cascade Plaza, Seventh Floor, Akron, Ohio 44308 for Plaintiff-Appellee, NO BRIEF FILED and

*Atty. Erik A. Schramm, Sr.*, Hanlon, McCormick, Schramm, Bickford & Schramm, Co. LPA, 46457 National Rd. West, St. Clairsville, Ohio 43950 and *Atty. Martin P. Sheehan,*

Sheehan & Associates, PLLC, 1 Community St., Suite 200, Wheeling, West Virginia 26003 for Defendant-Appellant

Dated: June 30, 2022

———————————————

**Robb, J.**

{¶1}  Defendant-Appellant Kristi Musilli appeals the decision of the Belmont County Common Pleas Court following a bench trial granting judgment in the amount of $26,476.77 plus interest to Plaintiff-Appellee St. Clairsville Pointe, Inc.  For the reasons expressed below, the trial court decision finding it had personal jurisdiction over Appellant and granting judgment in favor of Appellee is affirmed.  However, the amount of damages is modified to $21,569.00, plus interest at the statutory rate from the date of the trial court's judgment and costs.

<u>Statement of the Fact and Case</u>

{¶2}  Joann Musilli is Appellant's mother.  Joann had medical issues that resulted in her being placed in Appellee's care facility on October 28, 2015.  Joann signed the admission paperwork.  The medical issues resulting in her admission into Appellee's facility began a few years prior to her admission.  Prior to her placement, Joann resided with Appellant and had been in the hospital for an extended period.

{¶3}  Appellee's care facility is located in Belmont County, Ohio.  Joann previously resided in West Virginia.  Appellant has continually been a resident of West Virginia.

{¶4}  In May 2016, Appellant, through Appellee, submitted an Ohio Medicaid application on Joann's behalf to pay for her care at Appellee's facility.  That application was ultimately declined because Appellant did not have the proper authorization to sign. Joann later resubmitted the application on her own behalf.

{¶5}  While determining eligibility, the Ohio Department of Job and Family Services and an employee of Appellee communicated with Appellant and Joann.  It was determined in the five-year look back period for Medicaid, Appellant received approximately $90,000.00 in disqualifying transfers from Joann.

{¶6}  One transfer was real estate with a value of $16,000.  This property was transferred to Appellant about a year prior to Joann's admission into the facility.  Appellant

<u>Case No. 21 BE 0019</u>

was informed that the property should be transferred back to Joann and sold. The proceeds of the sale would then be used to pay for her care. Appellant transferred the property back to Joann, however, there was no evidence the property was ever sold.

{¶7} Other transfers of money occurred from Joann to Appellant during this time period amounting to approximately $84,000. The employee from the Ohio Department of Job and Family Services explained that if Appellant could show proof that the transfers actually went to benefit Joann, then the restricted period for collecting Medicaid benefits could be reduced. Appellant never provided this proof to the Department of Job and Family Services. At trial, Appellant did not offer any proof of what amount was used for Joann's benefit. Appellant also received Joann's social security benefits while Joann was residing at Appellee's facility.

{¶8} Joann died on December 12, 2016. At the time of her death, she owed Appellee $26,476.77. Her sole asset was her residence, which was valued at approximately $16,000. A probate estate was opened in West Virginia. Appellee did not file a claim.

{¶9} Appellant did not pay the balance owed, and Appellee filed a complaint against Appellant and a John Doe. 6/5/17 Complaint. The first three counts were asserted against the John Doe. 6/15/17 Complaint. Those three causes of action were later voluntarily dismissed. 8/10/18 Notice of Voluntary Dismissal; 8/15/18 J.E. The last two counts were asserted against Appellant. Count Four asserted a claim for unjust enrichment; that a constructive trust was created by operation of law; and that Appellee was the beneficiary of that trust. Count Five asserted that fraudulent transfers were made by Joann to Appellant in violation of Ohio's Uniform Fraudulent Transfer Act. 6/15/17 Complaint.

{¶10} Appellant did not defend the complaint and a default judgment was granted in Appellee's favor. 8/15/17 J.E. Appellant moved to vacate the default judgment, which was granted. 9/22/17 Motion to Set Aside Default Judgment; 11/30/17 J.E.

{¶11} Appellant then filed a Motion to Dismiss and Answer asserting, among other claims, that the trial court did not have personal jurisdiction over her. 12/8/17 Motion to Dismiss, Motion for More Definite Statement, and Answer. Appellee filed a Motion in Opposition to the Motion to Dismiss. 12/19/17 Opposition Motion.

Case No. 21 BE 0019

**{¶12}** Appellant then filed a motion for summary judgment or dismissal. 7/30/18 Motion. Appellee filed its own motion for summary judgment. 8/17/18 Motion. The trial court overruled both summary judgment motions and set the matter for trial. 8/29/18 J.E.

**{¶13}** The bench trial was held on September 12, 2019. Following trial, the parties filed proposed findings of fact and conclusions of law. The trial court issued its judgment with findings of fact and conclusions on law on March 5, 2021. The trial court found it had jurisdiction over the parties and the subject matter. It also found the transfers from Joann to Appellant were constructively fraudulent and granted judgment in favor of Appellee in the amount of $26,476.77. In reaching this decision, the trial court explained:

> C. In the few years before Joann Musilli's admission to Plaintiff's care facility, her financial affairs were controlled by Kristi Musilli. This relationship resulted in the transfer of most if not all of the assets of Joann Musilli and totaled more than $84,000.00. These transfers rendered Joann Musilli unable to pay for her care and, additionally ineligible for Medicaid benefits. These transfers were intended to render her uncollectible, were not supported by equivalent consideration, and occurred while Joann Musilli's health was failing during her 80's.
>
> D. Kristi Musilli was an insider who received substantially all of the assets, most of which were then concealed or became untraceable. As a result, Joann Musilli became practically insolvent. Kristi Musilli knew or should have known that Joann would become unable to pay Plaintiff for her continuing care.
>
> E. A trust by operation of law is appropriate as Kristi Musilli who caused or conspired to cause these transfers should not be entitled to retain them to the extent of Plaintiff's claims and losses.

3/5/21 J.E.

### Assignments of Errors

**{¶14}** Appellant lists nine assignments of error at the beginning of the brief, but fails to lay out those assignments of error in the argument section. Instead, Appellant sets three headings in the brief—Lack of Personal Jurisdiction, Count Four, and Count

Five. We address her arguments in the order they are presented. Appellee did not file a brief.

Personal Jurisdiction

**{¶15}** Appellant argues the Belmont County Common Pleas Court did not have personal jurisdiction over her because she was a resident of West Virginia, who has never lived in Ohio and has not engaged in a pattern of activity in Ohio. Alternatively, she contends that even if the court had personal jurisdiction due to her transactions in Ohio, any relevant transactions occurred before Joann was placed at Appellee's facility in October of 2015, and nothing occurring before this date can be considered.

**{¶16}** Personal jurisdiction is a question of law that appellate courts review de novo. *Kauffman Racing Equip., L.L.C. v. Roberts*, 126 Ohio St.3d 81, 2010-Ohio-2551, 930 N.E.2d 784, ¶ 27. "Determining whether an Ohio trial court has personal jurisdiction over a nonresident defendant involves a two-step analysis." *Id.* at ¶ 28. The first step is whether the long-arm statute and the applicable rule of civil procedure confer jurisdiction. If they do, then the second step is whether the exercise of jurisdiction would deprive the nonresident defendant of the right to due process of law under the Fourteenth Amendment to the United States Constitution. *Id.*

**{¶17}** Ohio's long-arm statute codified as R.C. 2307.382(A)(1) and Civ.R. 4.3(A)(1), governing service of process, permit a court to exercise personal jurisdiction over a nonresident defendant and provide for service of process when the cause of action arises from the nonresident's "transacting any business" in Ohio. The term "transacting business," for purposes of R.C. 2307.382(A)(1) and Civ.R. 4.3, has been broadly interpreted and encompasses "carrying on business" and "having dealings" in the state. *Hercules Tire & Rubber Co. v. Murphy*, 133 Ohio App.3d 97, 100, 726 N.E.2d 1080 (1999), citing *Kentucky Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 53 Ohio St.3d 73, 559 N.E.2d 477 (1990). ["P]ersonal jurisdiction does not require physical presence in the forum state." *Id.* Whether a defendant has transacted any business in Ohio is determined on the particular facts of the case. *U.S. Sprint Communications Co. Partnership v. Mr. K's Foods, Inc.*, 68 Ohio St.3d 181, 185, 624 N.E.2d 1048 (1994).

Case No. 21 BE 0019

**{¶18}** Here, evidence about Appellant's transactions and dealings was presented during summary judgment and at trial, and the trial court found it had personal jurisdiction over Appellant in its final judgment.

**{¶19}** As the trial court noted, the testimony showed that Appellant handled her mother's financial business while she resided in Appellee's facility, and before Joann agreed to a decision, she had to consult with Appellant. Kelli Loudon, the regional accounts receivable supervisor at Cumberland Pointe Care Center, states in her affidavit that although Joann signed her own admission agreement upon entering the facility, Appellee's representatives "were in regular contact with her family, in particular, Kristi Musilli, with regard to payments on her mother's account and applications for Medicaid funding." Aug. 17, 2018 Appellee's motion for summary judgment, Exh. 1.

**{¶20}** Testimony from the office manager at Appellee's facility, Evelyn Sindeldecker, was presented at trial. Sindeldecker testified that she primarily dealt with Appellant on Joann's account and that Joann wanted all decisions for her account to go through Appellant. Tr. 86. Sindeldecker also explained how she advised Appellant, based on the advice of an Ohio Job and Family Services representative, to transfer her mother's home, located in West Virginia, back into Joann's name in an effort to secure medical assistance on her mother's behalf. Tr. 88-90. Appellant and her mother's signatures on that deed were notarized in Belmont County, Ohio in June of 2016. Defendant's Trial Exh. 2.

**{¶21}** Further evidencing Appellant's "dealings" in Ohio is the fact that Appellant worked with Sindeldecker and an Ohio Job and Family Services representative in an effort to secure financial assistance for her mother's care at Appellee's Ohio facility. Plaintiff's Trial Exh. 3. In March of 2016, Appellant completed and executed Joann's initial Ohio Medicaid application through Ohio Job and Family Services, which was ultimately denied. Plaintiff's Trial Exh. 1.

**{¶22}** Based on the foregoing, we find Appellant had sufficient dealings with Appellee in Ohio to satisfy the long-arm statute here. *See Ricker v. Fraza/Forklifts of Detroit*, 160 Ohio App.3d 634, 2005-Ohio-1945, 828 N.E.2d 205, ¶ 14 (10th Dist.) (finding Michigan resident transacted business in Ohio based on his submitting payment for a

year's fee charged by consultant at his Ohio office and initiated contact by placing phone call to consultant's Ohio office).

{¶23} The analysis then turns to the Fourteenth Amendment Due Process Clause. The Sixth Appellate District has explained:

> The Fourteenth Amendment's Due Process Clause limits a state court's power to exercise jurisdiction over a defendant. A tribunal's authority depends on the defendant's having such "contacts" with the forum state such that "the maintenance of the suit" is "reasonable" and "does not offend traditional notions of fair play and substantial justice." *International Shoe Co.* at 316–17, 66 S.Ct. 154; *see also Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, —— U.S. ——, 141 S. Ct. 1017, 1019, 209 L. Ed.2d 225 (2021) (Commenting that *International Shoe* remains "[t]he canonical decision in this area.").

*XPX Armor & Equip., Inc. v. SkyLIFE Co.*, 2021-Ohio-2559, 176 N.E.3d 821, ¶ 21 (6th Dist.). *See also Heredia Realty, LLC v. Harvey*, 1st Dist. Hamilton No. C-210313, 2021-Ohio-4218, ¶ 9-10.

{¶24} The Sixth District explained it uses a three-part test: (1) the out-of-state resident "purposefully availed" themselves of the privilege of acting in Ohio or causing a consequence in Ohio; (2) the cause of action must arise from the out of state resident's activities in Ohio, and (3) the out of state resident's acts or consequences must have a substantial enough connection with Ohio to make exercise of jurisdiction reasonable. *Id.* at ¶ 35.

{¶25} To demonstrate "purposeful availment," the Ohio resident must show that the out-of-state resident's contact proximately resulted from the out of state resident's own conduct that created a "substantial connection" with Ohio. *Id.* at ¶ 36. This was met by Appellant seeking Medicaid benefits for Joann in Appellee's Ohio facility and controlling Joann's health and financial affairs. It is of little consequence that the Medicaid benefit paper Joann signed was denied because she was not authorized to make that request. Her action of signing it created a connection to Ohio. Furthermore, Appellant controlled all of Joann's finances and health matters; Appellant arranged for Joann to stay in the Appellee's facility in Ohio and Appellant paid Joann's bills including her monthly bill

with Appellee. Appellant maintained her connection with Ohio by her continued control of Joann's finances and health matters. Additional evidence of her control and connection to Ohio is the fact that the deed transferring the real estate back to Joann was notarized in Ohio. Appellant took that action based on the information she received from the Ohio Department of Job and Family Services. Appellant was informed the prior transfer would affect Joann's ability to obtain Medicaid benefits in Ohio. Based on that advice, Appellant transferred the property back to Joann. While one act alone might not constitute purposeful availment, when several acts are considered in conjunction, purposeful availment is met.

{¶26} For the second part, "If a nonresident's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contacts." *Id.* at ¶ 38. As stated, the contact is the control of Joann's financial and health matters. Here, the action is for a constructively fraudulent transfer, i.e., conveying assets to Appellant and causing Joann to be unable to pay her debt to Appellee. The alleged fraudulent transfers made Joann unable to pay for her healthcare in Ohio. Although the majority of the monetary transactions occurred in West Virginia prior to Joann's admission into Appellee's facility and prior to the contact with Ohio, a four-year look back period is part of the Ohio Fraudulent Transfer Act as set forth in R.C. 1336.04.

{¶27} As to the third prong, "Once a plaintiff satisfies the first two parts of the test by demonstrating a prima facie case, "'then an inference arises that this third factor is also present.'" *Id.* at ¶ 40. This inference applies in all but "the unusual case." *Id.* The Sixth Appellate District aptly explained:

> Exercise of personal jurisdiction does not offend due process in this instance. "A State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." (Citations omitted.) *Burger King*, 471 U.S. at 473, 105 S.Ct. 2174, 85 L.Ed.2d 528. In cases where an out-of-state actor has purposefully acted and derived a benefit from their activities, moreover, "it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities[.]" *Burger King* at

474, 105 S.Ct. 2174, citing *Kulko v. California Superior Court*, 436 U.S. 84, 96, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978).

*Id.* at ¶ 43.

**{¶28}** Here it is clear the third element is met. Appellant testified there were only two facilities that were able to offer Joann the care she needed. One was Appellee's facility in Ohio and one was in West Virginia. Appellant and Joann arranged for Joann to be admitted to Appellee's facility. It is presumed and appears Appellant received a benefit in having her mother in Appellee's facility receiving the care she needed. Appellant's conduct of facilitating Joann's depletion of her assets had substantial consequences in Ohio.

**{¶29}** In conclusion, we agree with the trial court's conclusion that it had personal jurisdiction. Any arguments to the contrary are overruled.

Count Four:  Constructive Trust/Unjust Enrichment

**{¶30}** Appellant begins this argument by stating Count Four of the complaint was not plead with specificity for an understanding of what was alleged. This issue was raised in Appellant's Motion to Dismiss and Motion for More Definite Statement. 12/8/17 Motion. The trial court concluded, pursuant to the civil rules, that Appellee was required to plead sufficient operative facts to provide Appellant with fair notice of the nature of the action. It determined that was met. 1/9/18 J.E. Appellant did not appeal that ruling. 5/14/21 Notice of Appeal. Thus, this issue is not properly before this court.

**{¶31}** Regardless, from reading the complaint it is clear that Appellee alleged Joann, the debtor, transferred assets for no value to Appellant, who retained the assets. Appellant had a duty to convey the amount necessary to satisfy Joann's debt. Allowing her to retain the money and not pay for Joann's bill for nursing care resulted in Appellant being unjustly enriched. It then asserted as she was unjustly enriched, Appellant holds the assets transferred to her for no value in a constructive trust for Appellee's benefit.

**{¶32}** The language used in Count Four sets forth an unjust enrichment claim and asked for a constructive trust. A constructive trust is an equitable remedy for unjust enrichment. *Ferguson v. Owens*, 9 Ohio St.3d 223, 225, 459 N.E.2d 1293 (1984) ("A constructive trust is, in the main, an appropriate remedy against unjust enrichment. This type of trust is usually invoked when property has been acquired by fraud."). That said,

the language used in that count also is indicative of alleging a violation of the Ohio Fraudulent Transfer Act.

**{¶33}** Count Five of the complaint sets forth the applicable Fraudulent Transfer Act statute. However, that does not mean Count Four could not be intertwined with Count Five and also allege a violation of the Fraudulent Transfer Act and specifically ask for a constructive trust as the remedy. "[A] constructive trust may also be imposed where it is against the principles of equity that the property be retained by a certain person even though the property was acquired without fraud." *Id.* at 226. The Second Appellate District has stated the language of R.C. 1336.07(A)(3)(c) appears to indicate that a constructive trust is a possible remedy for a violation of the Ohio Uniform Fraudulent Transfer Act. *Kingston of Miamisburg LLC v. Jeffery*, 2d Dist. Montgomery No. 28087, 2019-Ohio-1905, ¶ 29. That provision provides:

> (3) Subject to the applicable principles of equity and in accordance with the Rules of Civil Procedure, any of the following:
>
> (a) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;
>
> (b) Appointment of a receiver to take charge of the asset transferred or of other property of the transferee;
>
> (c) Any other relief that the circumstances may require.

R.C. 1336.07.

**{¶34}** Considering the language of the statute, a constructive trust is a remedy for violating the Fraudulent Transfer Act.

**{¶35}** Appellant makes multiple arguments why the theory of unjust enrichment is unavailable. Those arguments do not need to be addressed because the trial court did not base its decision on unjust enrichment, rather the trial court found:

> 7. Plaintiff is entitled to the relief request in its Fourth and Fifth Causes of Action. That is, Plaintiff established that Joann Musilli, with the aid, supervision, and control supplied by Kristi Musilli, engaged in **fraudulent transfers** to Kristi Musilli such that a constructive trust should be imposed upon those transfers for Plaintiff's benefit.

Case No. 21 BE 0019

\* \* \*

C.  In the few years before Joann Musilli's admission to Plaintiff's care facility, her financial affairs were controlled by Kristi Musilli.  This relationship resulted in the transfer of most if not all of the assets of Joann Musilli and totaled more than $84,000.00.  These transfers rendered Joann Musilli unable to pay for her care and, additionally ineligible for Medicaid benefits.  These **transfers were intended to render her uncollectible, were not supported by equivalent consideration**, and occurred while Joann Musilli's health was failing during her 80's.

D.  Kristi Musilli was an **insider** who received substantially all of the assets, most of which were then concealed or became untraceable.  As the result, Joann Musilli became practically insolvent.  Kristi Musilli **knew or should have known** that Joann **would become unable to pay** Plaintiff for her continuing care.

E.  A trust by operation of law is appropriate as Kristi Musilli who caused or conspired to cause these transfers should not be entitled to retain them to the extent of Plaintiff's claims and losses.

(Emphasis added).  3/5/21 J.E.

**{¶36}** The foregoing emphasized words are elements of the fraudulent transfer act, which is discussed below.  There was no finding of unjust enrichment.  Rather, the trial court determined a violation of the Fraudulent Transfer Act occurred and based the implementation of the constructive trust remedy on that finding.

**{¶37}** The trial court does state that Appellee is entitled to relief under its fourth and fifth causes of action.  The fourth cause of action is primarily unjust enrichment. However as explained, the statements in the fourth cause of action mimic some of the elements of fraudulent transfers.  Furthermore, the fourth cause of action requests a constructive trust.  Therefore, when the trial court indicated it was granting relief under the fourth cause of action, when considering the entire judgment and the language of the

complaint, the trial court found a fraudulent transfer and a constructive trust, not unjust enrichment.

**{¶38}** Appellant also argues that Appellee is trying to collect under the Medicaid Estate Recovery Program.  She asserts Appellee cannot collect under this theory because it does not have standing and there was no attempt by the Department of Job and Family Services to recover Medicaid payments because no payments were made.

**{¶39}** There is reference to Medicaid in this instance, but it is not an allegation of Medicaid fraud or a claim under the Medicaid Estate Recovery Program because benefits under that government program were not granted or obtained.  The references to Medicaid were evidence tending to show that Joann reasonably should have known that she would be unable to pay Appellee.  Appellee was not attempting to collect under Medicaid fraud or the Medicaid Estate Recovery Program.

**{¶40}** In conclusion, the arguments pertaining to Count Four fail.

<u>Count Five:  Fraudulent Transfer</u>

**{¶41}** This assignment of error consists of four sub-arguments.  Appellant first asserts Appellee failed to establish Joann's insolvency.  Second, Appellant challenges the trial court's finding as against the manifest weight of the evidence.  Third, Appellant contends that the significant transfers by Joann to Appellant occurred beyond the statutory four-year look back period.  Finally, Appellant alleges Appellee's claim is barred because it did not file a claim against Joann's estate.

**{¶42}** The Fraudulent Transfer Act, R.C. 1336.04(A), provides a creditor two avenues of relief—actual fraud and constructive fraud.  The statute states in part:

> (A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before, or within a reasonable time not to exceed four years after, the transfer was made or the obligation was incurred, *if the debtor made the transfer or incurred the obligation in <u>either</u> of the following ways*:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor;
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

<u>Case No. 21 BE 0019</u>

(a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

(b) *The debtor* intended to incur, or believed or *reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay* as they became due.

(Emphasis added.)  R.C. 1336.04.

**{¶43}** Here, Appellee's complaint does not identify under which subsection it sought to recover.  Notwithstanding, the trial court's March 5, 2021 decision and findings make clear that it employed the constructive fraud theory under R.C. 1336.04(A)(2).  It found that the debtor (Joann) made certain transfers to Appellant without Joann receiving a reasonably equivalent value in exchange, and at the same time, the debtor (Joann) should have known that she would be unable to pay her obligations to her creditor (Appellee).

**{¶44}** Because the evidence supports the trial court's findings and award under R.C. 1336.04(A)(2) for constructive fraud, we do not address R.C. 1336.04(A)(1) and whether Appellee established "actual intent" as required under that subsection.  Consequently, we likewise do not address the factors in R.C. 1336.04(A)(B), which are to be considered when assessing whether a debtor had "actual intent to hinder, delay, or defraud" her creditor.  *Id.*

**{¶45}** As stated, Appellant first claims that Appellee failed to establish that Joann was insolvent and that proof of insolvency is a necessary element of establishing a fraudulent transfer in violation of R.C. 1336.04.  However, a plain reading of R.C. 1336.04(A)(2) shows this is not a required element.  To the contrary, the debtor's insolvency is one of several listed factors to consider upon assessing whether the debtor had "actual intent to hinder, delay, or defraud" one's creditor.  R.C. 1336.04(B).  Thus, Appellee was not required to establish Joann's insolvency, and this argument lacks merit. *Id.*

**{¶46}** Second, Appellant asserts the trial court erred by finding that constructive fraud was proven.  Appellant contends that the finding that Joann reasonably should have

believed that she would incur debts beyond her ability to pay is against the manifest weight of the evidence. Because she limits her argument to this element, our review is equally limited.

{¶47} When reviewing civil appeals from bench trials, an appellate court applies a manifest weight standard of review. *Revilo Tyluka, L.L.C. v. Simon Roofing & Sheet Metal Corp.,* 193 Ohio App.3d 535, 2011-Ohio-1922, 952 N.E.2d 1181 (8th Dist.), citing App.R. 12(C); *Seasons Coal v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984). Judgments supported by some competent, credible evidence going to all the material elements of the case must not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus (1978). *See, also, Gerijo, Inc. v. Fairfield*, 70 Ohio St.3d 223, 226, 638 N.E.2d 533 (1994). Reviewing courts must oblige every reasonable presumption in favor of the lower court's judgment and finding of facts. *Gerijo*, 70 Ohio St.3d at 226, citing *Seasons Coal Co.* If the evidence is susceptible to more than one interpretation, then we must construe it consistently with the lower court's judgment. *Id.* In addition, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts. *Kalain v. Smith*, 25 Ohio St.3d 157, 162, 495 N.E.2d 572 (1986).

{¶48} As stated, Appellant takes issue with the trial court's determination that Joann incurred this obligation with Appellee and "should have believed" or "reasonably believed" that she would incur debts beyond her ability to pay. R.C. 1336.04(A)(2).

{¶49} The trial court found in part:

In the few years before Joann Musilli's admission to Plaintiff's care facility, her financial affairs were controlled by Kristi Musilli. This relationship resulted in the transfer of most if not all of the assets of Joann Musilli * * *. These transfers were intended to render her uncollectible, were not supported by equivalent consideration, and occurred while Joann Musilli's health was failing during her 80's.

The foregoing findings support the trial court's constructive fraud holding.

{¶50} Moreover, the evidence presented at trial establishes that Joann entered Appellee's facility suffering from several different health issues and that Appellant, a nurse, was unable to care for her mother based on Joann's increased needs. Joann was

in her eighties. Before Joann admitted herself into Appellee's facility, she began transferring her assets to Appellant, and once admitted, Joann, with Appellant's help, continued to transfer her monthly benefit checks to Appellant. Given the inferences that could be drawn from the surrounding circumstances, the trial court's conclusion that Joann reasonably knew that she would incur debts beyond her ability to pay is supported by competent credible evidence. The trial court was in the best position to determine credibility.

{¶51} Appellee cited a First Appellate District decision to support its position the above were fraudulent transfers. In that case, a mother transferred her house to her son for no value seven months prior to entering a nursing home. She died five months later. The mother was ineligible for Medicaid due to the transfer and became increasingly indebted to the nursing home. Her estate could not pay the nursing home bill. The nursing home sued the son based on the fraudulent transfer act. The trial court granted summary judgment for the nursing home. The son appealed. *Lifesphere v. Sahnd*, 179 Ohio App.3d 685, 2008-Ohio-6507, 903 N.E.2d 379 (1st Dist.).

{¶52} In affirming, the appellate court concluded the mother, an 80-year-old woman, should have reasonably believed she could enter a nursing home in the near future or require some other form of major medical treatment. *Id.* at ¶ 15. It explained:

> Kathleen gave her home to her son, leaving her with monthly social-security and pension checks as sources of income. Otherwise she had little or no assets. We are convinced, for purposes of Lifesphere's claim, that the transfer from Kathleen to Jack violated Ohio's statute against fraudulent conveyances because after the transfer of the bulk of her assets, Kathleen should have reasonably believed that she would incur debts beyond her ability to pay as they became due.

> We hold that anyone, of any age, who transfers their major asset without consideration, leaving little or no assets, is liable to creditors who shortly thereafter extend credit without knowledge of the transfer. Of course, an action seeking to set aside a property transfer under the fraudulent-

conveyance statutes is subject to the one- and four-year time limitations found in R.C. 1336.09.

*Id.* at ¶ 16-18.

**{¶53}** Based on the foregoing, Appellant's second sub-argument lacks merit and is overruled.

**{¶54}** Appellant's third sub-argument contends that Joann's significant transfers to Appellant occurred beyond the statutory four-year look back period, and thus, they cannot be considered; cannot be "avoided;" and cannot be subject to an award in Appellee's favor.

**{¶55}** The look-back period applies regardless of whether the claim consists of actual intent or one for constructive fraud. R.C. 1336.04(A) states in part: "A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before, or within a reasonable time not to exceed four years after, the transfer was made or the obligation was incurred * * *.

**{¶56}** Appellant contends the four-year time frame for fraudulent transfers cannot be met because Joann closed her savings account in April 2012 and the May 6, 2012 statement showed a zero balance. That bank account had $60,755.99 at the time of its closing. 8/17/18 Appellee's Response to Appellant's Motion for Summary Judgment, Exhibit 1-C; Tr. 109. Joann's bill for Appellee's facility was paid through June 2016. Tr. 100; Plaintiff's Exhibit 8. The money ($26,476.77) owed was for services provided after June 2016 until Joann's death in December 2016. Tr. 100; Plaintiff's Exhibit 4. Testimony indicated that Appellee was told Joann would not be able to pay for services starting in July 2016 after Medicaid was denied. Tr. 95. The dates between when she was no longer able to pay her bill and the date of the transfer of the funds from the savings account are more than four years apart. Thus, Appellant asserts that the approximately $60,755.99 is unreachable for that reason alone.

**{¶57}** The evidence indicates Joann paid all of her bills until July 2016. Plaintiff's Exhibit 8. It was from then until her death in December 2016 that she was unable to pay Appellee. Plaintiff's Exhibit 8. The testimony and exhibits establish this savings account was closed more than four years before she was unable to pay. The testimony indicates Joann transferred this entire amount to Appellant. Tr. 50. Appellant testified Joann gave

Case No. 21 BE 0019

it to her because Joann lived with her and Appellant helped care for Joann. Tr. 50. Appellant stated she used part of the money to pay for her sons' college and part was used to pay for Joann's medical bills. Tr. 50-51.

**{¶58}** At the time of these events, Medicaid had a five-year look back period and Joann applied for Medicaid in May 2016, and then Joann later refiled the paperwork on her own behalf. Appellant did not provide evidence or receipts indicating how much of that $60,000.00 was used to pay for Joann's care. Thus, Medicaid denied the application because the transfer was within their five-year look back period.

**{¶59}** The debt Joann incurred, but was not paid to Appellee, occurred from June 2016 through December 2016. The savings account transfer to Appellant was in April 2012 beyond the look-back period by the fraudulent transfer act. Thus, Appellant argues the $60,000.00 from the savings account is unreachable. We agree.

**{¶60}** The trial court determined Appellant received at least $84,000.00 in disqualifying transfers. This amount includes the approximate $60,000 savings account transfer. Considering there was a four-year look back period, the trial court's finding is incorrect; the trial court could only look back four years, not five. The approximately $60,000.00 from the savings account was unreachable because it was transferred beyond the four-year look back period.

**{¶61}** Excluding the amount in the savings account, the evidence submitted at trial indicated there was $24,089.00 from a checking account that was transferred directly to Appellant or other family members during the four-year look back period.

**{¶62}** This approximate $24,000.00 does not include the appraised value of the house owned by Joann. The house was originally transferred to Appellant in October 2014 for no consideration. The property was transferred back to Joann in 2016. Therefore, the home cannot be considered to be held in trust because it was not held in Joann's name. That said, what occurred with that real estate is evidence of intent on the part of the Joann to defraud her creditors. The property was transferred back to Appellant only after Appellant and Joann were told that the transfer of the property made Joann ineligible for Medicaid because it occurred during the Medicaid five-year look back period. They were advised to put the real estate for sale at fair market value so the proceeds of

the sale would be used to pay for her care. There was no evidence the real estate was placed on the market.

{¶63} At trial, Appellee established the amount of money transferred to Appellant or family members from the checking account during the look-back period. Tr. 56-59, 61-63. The evidence indicated it totaled $24,089.00. Tr. 56-59, 61-63. The amount that was transferred to Appellant was $22,614.00. Tr. 56-59, 61-63; Plaintiff's Exhibits 5 and 6. The trial court heard testimony regarding this amount and questions were asked about how it was spent. Appellant explained that Joann could not get to the bank, so she wrote checks to Appellant to provide Joann with cash to spend, or it was used for different things. Appellant's testimony was vague and lacked detail. There was also no corresponding documentation evidencing how this money was used. Furthermore, there were multiple checks made payable to Appellant that were for $1,300.00, which was consistent with the amount of Joann's monthly social security benefit. Tr. 53.

{¶64} Although the amount from the savings account is not collectable in this litigation, it is relevant evidence tending to show that Joann reasonably should have known that she would be unable to pay for her care and debt incurred with Appellee. When asked by the Department of Job and Family Services to provide documentation of the amount in the savings account used to pay for Joann's care while she was living with Appellant, Appellant did not provide any proof. At trial, the court heard testimony from Appellant indicating she used some of it to pay for Joann's needs, but she provided no documentation evidencing how it was spent.

{¶65} That said, the amount of the judgment must be modified to $21,569.00. As stated, the amount transferred from the checking account to Appellant or family members was $24,089.00. However, the amount transferred to Appellant was $22,614.00. The amounts written to other family members were $500 each to two grandchildren and checks written to Appellant's sister which indicated in the memo line they were a reimbursement for home care medical supplies and reimbursement for Christmas gifts for the grandchildren. These two checks were written after Joann entered Appellee's facility. Those amounts cannot be included in the constructive trust. Likewise, it is also noted that one of the checks written to Appellant in December 2015 (a year before Joann died while she was in Appellee's facility) was for $1,045.00 and the memo line of the check

indicates "Mr. Calvary Opening of grave." It seems logical this amount would be for her mother's benefit and was not a fraudulent transfer. Thus, the amount that was fraudulently transferred was $21,569.00. Accordingly, this aspect of Appellant's argument has merit in part, and the amount of the judgment is modified to $21,569.00 to reflect the fraudulent transfers.

**{¶66}** Last, under this section Appellant argues Appellee's claim is barred based on its failure to file a claim with the estate. An estate was opened in probate court in West Virginia after Joann died. Appellee did not assert a claim against the estate for the unpaid funds. The Tenth Appellate District was asked to determine if the provisions in R.C. 2117.06 time bar a complaint for fraudulent transfer under R.C. Chapter 1336 when a claim was not made against the estate or filed in the probate case. *Brown Bark II, L.P. v. Coakley*, 188 Ohio App.3d 179, 2010-Ohio-3023, 934 N.E.2d 991, ¶ 7 (10th Dist.). R.C. 2117.06(A) states, "all creditors having claims against an estate, including claims arising out of contract, out of tort, on cognovit notes, or on judgments, whether due or not due, secured or unsecured, liquidated or unliquidated, shall present their claims" after appointment of an executor/administrator and prior to the filing of a final account or certificate of termination in the manner prescribed by the statute. R.C. 2117.06(A)(1).

**{¶67}** The appellate court determined the estate is not a necessary party to the fraudulent transfer action, and as such, there does not need to be a claim asserted against the estate in probate:

> More recent Ohio decisions entertain claims of fraudulent transfer brought solely against the transferees of property and not against the debtors. See, e.g., *Lifesphere v. Sahnd,* 179 Ohio App.3d 685, 2008-Ohio-6507, 903 N.E.2d 379 (involving creditor nursing home that brought fraudulent-transfer action against debtor's son, the transferee, but not against the debtor-transferor who transferred real estate to her son before incurring large debts to nursing home); *Farm Supply Ctr., Inc. v. Smith,* 5th Dist. No. 2008–CA–13, 2008-Ohio-5368, 2008 WL 4599627 (allowing creditor farm-supply store to bring fraudulent-transfer action against transferee of real estate without naming debtor-transferor as party); *Ford v. Star Bank, N.A.* (Aug. 27, 1998), 4th Dist. No. 97CA39, 1998 WL 553003 (permitting fraudulent-transfer

action against transferee bank when husband and wife debtors of plaintiff creditor both had filed bankruptcy).

Because the debtor-transferor Bales retained no interest in the property, he is not a necessary party to plaintiff's fraudulent transfer. Plaintiff is not required to name Bales or his estate a party-defendant in its fraudulent-transfer action; commencing the action against the transferee-defendant is sufficient. As a result, plaintiff's action is not a claim against Bales's estate such that R.C. 2117.06 would operate to time-bar it.

*Id.* at ¶ 21-22.

**{¶68}** We agree with *Brown Bark II* and find that Appellee did not have to make a claim against Joann's estate. Thus, this aspect of this assigned error lacks merit.

<u>Conclusion</u>

**{¶69}** The trial court had personal jurisdiction over Appellant. The basis of the trial court's judgment and imposition of a constructive trust was the finding of fraudulent transfers under the Fraudulent Transfer Act. The trial court's decision is affirmed in part and modified in part. The judgment for Appellee is affirmed; however, the judgment is modified to $21,569.00, plus interest at the statutory rate and costs from the date of the trial court's judgment.

Donofrio, P J., concurs.

D'Apolito, J., dissents with dissenting opinion.

<u>Case No. 21 BE 0019</u>

D'Apolito, J., dissenting opinion.

{¶70} For the following reasons, I find that the trial court did not have personal jurisdiction over Appellant.  In the alternative, I find that there is no competent, credible evidence of fraudulent intent, and no competent, credible evidence that Joann intended to incur, or believed or reasonably should have believed that she would incur, debts beyond her ability to pay as they became due.  Accordingly, I would vacate the judgment entry of the trial court for lack of personal jurisdiction and dismiss the case, or in the alternative, reverse and vacate the judgment entry of the trial court as it is not supported by the manifest weight of the evidence.

{¶71} Ohio's long-arm statute reads, in pertinent part, "A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's * * *[t]ransacting any business in this state." (Emphasis added.)  The majority concludes that Appellant transacted business in Ohio because "Appellant handed all of her mother's financial business while she resided in Appellee's facility, and before Joann agreed to a decision she had to consult with Appellant." See infra, ¶ 19. The majority further predicates personal jurisdiction on the fact that Appellant signed Joann's original application for Medicaid and transferred Joann's West Virginia residence back to Joann after Joann's second application was rejected.

{¶72} However, I find that Appellant was acting as Joann's agent when she attempted to submit Joann's original application for Medicaid and made decisions regarding Joann's medical care.  For instance, when asked whether Joann wrote a check in the amount of $9,895.00 to Appellee, Appellant responded, "She didn't write it. I wrote it for her as she directed me to [sic]."  (Trial Tr., p. 66.)  Therefore, Appellant's actions undertaken on behalf of Joann are evidence of the transaction of business in Ohio by Joann, not by Appellant.  Moreover, Appellant's act of transferring the residence in West Virginia back to Joann to facilitate Joann's Ohio Medicaid application is insufficient to demonstrate the transaction of business by Appellant in Ohio.  Accordingly, I find that Ohio's long-arm statute does not confer jurisdiction over Appellant.

{¶73} With respect to due process, the Ohio Supreme Court observed in *Burger King*, *supra*, that where an out-of-state actor has purposefully acted and derived a benefit from their activities, it may well be unfair to allow them to escape having to account in

other states for consequences that arise proximately from such activities. In concluding that Ohio had personal jurisdiction over Appellant, the majority reasons that "[i]t is presumed and appears that Appellant received a benefit in having Joann in Appellee's facility receiving the care she needed." See infra, ¶ 28. However, Joann, not Appellant, was the recipient of the benefit provided by Appellee. Therefore, I find that Appellant did not purposefully avail herself of the privilege of acting in Ohio or causing a consequence in Ohio, nor did she derive a benefit from her activities here.

{¶74} Of equal import, the majority's conclusion that Appellant's actions undertaken on behalf of Joann constitute sufficient contact with Ohio to establish personal jurisdiction over Appellant contravenes an important public policy that encourages adult children to oversee the care of their elderly parents. The majority's decision discourages non-resident children from being actively involved in their parents' care when their involvement could subject them to a lawsuit in a foreign jurisdiction.

{¶75} Furthermore, even assuming that the trial court had personal jurisdiction over Appellant, I find no competent, credible evidence of fraudulent intent. See R.C. 1336.04(A)(1). In addition to other relevant considerations, fraudulent intent may be shown where the transfer is made to an insider, substantially all of the assets of the debtor are transferred, assets are concealed or removed, and where the debtor was insolvent or became insolvent shortly after the transfer at issue was made. See R.C. 1336.04(B). Although the transfers at issue here were made to an insider, I find no additional indicia of fraud in the record. I likewise find no competent, credible evidence that Joann intended to incur, or believed or reasonably should have believed that she would incur, debts beyond her ability to pay as they became due. See R.C. 1336.04(A)(2).

{¶76} While I agree with the majority that a claim against the estate of a debtor is not a prerequisite to a fraudulent transfer action against the transferee, Joann's insolvency is a relevant consideration of Appellee's fraudulent transfer claim under subsection (A)(1), and the reasonable belief that Joann would incur debts beyond her ability to pay is an element of the fraudulent transfer claim under subsection (A)(2). However, there is no evidence that substantially all of Joann's assets were transferred or that assets were concealed or removed. Likewise, there is no evidence that Joann was

insolvent or should have reasonably believed that she would incur debts beyond her ability to pay when the various transfers were made.

**{¶77}** Appellee relied on Joann's ineligibility for Medicaid based on the roughly $90,000.00 in transfers between 2012 and 2015, which resulted in the imposition of a fourteen-month restricted period, to prove its fraudulent transfer claims. However, Joann did not complete the section of her Medicaid application that inquires, "[h]ow much do you and the people in your home have in cash, checking, or savings (Such as bank accounts, annuities, stocks, or bonds)?" Consequently, I find that Joann's Medicaid application is not competent, credible evidence that she knew or should have reasonably believed that she would incur debts beyond her ability to pay as they came due.

**{¶78}** Moreover, it is important to distinguish Medicaid eligibility from a fraudulent transfer claim. No fraudulent intent or evidence of insolvency or future insolvency is required to invalidate a transfer in a Medicaid eligibility determination. ODJFS need only show that a transfer was made and no equivalent value was received.

**{¶79}** The majority concludes that most of the transfers at issue were fraudulent, based on the presumption that Joann's sole asset was the West Virginia residence. *See infra*, ¶ 8 ("[Joann's] sole asset was her residence, which was valued at approximately $16,000.00.") However, Appellee did not establish Joann's net worth when any of the transfers were made. Although the record contains selected checks from Joann's checking account, the balances of the checking account at all times relevant to Appellee's claims were not in the record.

**{¶80}** Further, the majority presumes the value of Joann's estate, as no evidence of the value of her estate was offered into evidence. The only testimony regarding the value of the estate was offered by Sindeldecker, who testified that she did not know the value of Joann's estate. (Trial Tr., p. 100.)

**{¶81}** The majority cites with favor the First District's opinion in *Lifesphere*, *supra*. However, the First District plainly states that the debtor's estate in that case "could not pay her nursing home bills." *Lifesphere*, 2008-Ohio-6507, ¶ 4. Further, the First District reasons that the debtor gave her son her home, "leaving her with monthly social security and pension checks as sources of income. Otherwise she had little or no assets." *Id.* at ¶ 17. Similar evidence of Joann's assets was not offered in this case.

**{¶82}** The issue of fraudulent intent is to be determined in view of the facts and circumstances of each case and "[t]he burden of proof in an action to set aside a fraudulent conveyance must be affirmatively satisfied by the complainant." *Stein*, *supra*, at 308. Because Appellee failed to establish fraudulent intent, or that Joann intended to incur, or believed or reasonably should have believed that she would incur, debts beyond her ability to pay as they became due, I would reverse the judgment entry of the trial court.

**{¶83}** Finally, in *Bd. of Trustees of Ohio Carpenters' Pension Fund v. Ramunno*, 7th Dist. Mahoning No. 19 MA 0084, 2021-Ohio-4667, we recognized that "it is specifically well-established that once the [Fraudulent Transfer Act] plaintiff meets its burden of establishing a fraudulent transfer under R.C. 1336.04, the burden shifts to the defense." *Id.* at ¶ 25. Insofar as Appellee failed to meet its initial burden, I find that the burden of proof never shifted to Appellant.

**{¶84}** For the foregoing reasons, I respectfully dissent.

Case No. 21 BE 0019

_____

For the reasons stated in the Opinion rendered herein it is the final judgment and order of this Court that the basis of the trial court's judgment and imposition of a constructive trust was the finding of fraudulent transfers under the Fraudulent Transfer Act. The trial court's decision is affirmed in part and modified in part. The judgment for Appellee is affirmed; however, the judgment is modified to $21,569.00, plus interest at the statutory rate and costs from the date of the trial court's judgment. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**