[Cite as *Tancer v. Charter Oaks Dev., Ltd.*, 2026-Ohio-136.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

DANIEL K. TANCER et al.,

Plaintiffs-Appellees,

v.

CHARTER OAKS DEVELOPMENT, LTD.,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 25 MA 0051**

---

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2022 CV 01835

**BEFORE:**
Carol Ann Robb, Mark A. Hanni, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed in part, Reversed in part, Remanded.

---

*Atty. Charles E. Dunlap*, for Plaintiffs-Appellees and

*Atty. Thomas C. Nader*, Nader and Nader, for Defendant-Appellant.


Dated:  January 15, 2026

**Robb, P.J.**

{¶1}    Appellant, Charter Oaks Development, Ltd. (Charter Oaks), appeals the trial court's judgment overruling its objections after a bench trial to the magistrate.  Charter Oaks contends the trial court erred by awarding Appellees, Daniel and Paula Tancer (the Tancers), damages to replace their French doors and attorney's fees.  For the following reasons, we affirm in part, reverse in part, and remand.

<u>Statement of the Case</u>

{¶2}    The Tancers hired Charter Oaks to construct their home in 2019.  The Tancers filed their complaint in October of 2022 against Charter Oaks.  The Tancers' first claim for relief asserts Charter Oaks failed to complete the construction of their new home in a timely manner.  They claim to have suffered emotional distress as a result.  Their second claim for relief asserts Charter Oaks' construction failed to satisfy certain standards and the terms of the parties' contract.  They alleged the construction was performed in a negligent and unworkmanlike manner.  They also alleged the cost to repair, replace, and complete the deficient work totaled $82,250.  For damages, the Tancers sought economic and noneconomic damages, attorney's fees, costs, and interest.  They attached the home construction contract to their complaint as exhibit A. (October 11, 2022 Complaint.)

{¶3}    Charter Oaks filed an answer and a counterclaim.  For its counterclaim, Charter Oaks alleged the Tancers upgraded certain finishings that exceeded the contractual allowances.  Charter Oaks sought $2,222.82 for these excess allowances. The counterclaim states an accounting detailing the excess allowances is attached as an exhibit, but nothing is attached.  (December 2, 2022 Answer & Counterclaim.)

{¶4}    The Tancers' reply to the counterclaim asserts in part that Charter Oaks has not disclosed a full and complete cost breakdown for the construction.  The Tancers also contend they were entitled to a setoff in the amount of $18,500 for savings related to septic construction.  (December 19, 2022 Reply.)

{¶5}    The parties exchanged discovery.  The Tancers moved to compel answers to interrogatories numbered five, six, seven, and nine.  (June 29, 2023 Motion to Compel.) Charter Oaks opposed.  The trial court granted the motion in part and ordered Charter

<u>Case No. 25 MA 0051</u>

Oaks to answer interrogatory number nine within 14 days.  The court denied the motion as to interrogatories five, six, and seven.  (August 16, 2023 Judgment.)

**{¶6}**  The case was sent to mediation, which resulted in an impasse.  (March 4, 2024 Mediation Report.)  Trial to the court was set for September of 2024.  The Tancers moved the court for the magistrate, as the trier of fact, to view the property.  (August 16, 2024 Motion.)  This motion was granted.  The court sua sponte continued the trial date and property view.  The trial was reset to November 18, 2024.

**{¶7}**  Charter Oaks filed a motion in limine seeking to preclude the Tancers from arguing and presenting evidence about alleged damage to the foundation of the home.  For cause, Charter Oaks claimed the Tancers advised it and the court of four issues that were the subject of its claims, such that Charter Oaks did not secure the evidence needed to dispute the claim of foundational damage.  Thus, Charter Oaks sought verification of the four issues to be tried to the court, i.e., the front door, French doors, showers, and rear patio.  (Motion in limine.)

**{¶8}**  Trial proceeded on November 18, 2024 before the magistrate on the four stipulated issues.  The Tancers offered the testimony of James DiMuzio, owner of Koncrete Dezign, LLC.  He viewed the Tancer property and inspected the back patio, which is approximately eight by twenty feet.  Upon examining the patio, DiMuzio determined it needed replaced because of the "finish and the way the job was performed, workmanship."  He further said the surface is not satisfactory and the patio sloped toward the house.  And while DiMuzio agreed a repair option existed, stating "they could try to pump it up, but the surface of that was not a very good finish . . . So I mean, pumping it up is just like putting makeup on a pig."  To replace it, DiMuzio said he would "tear it out, redo the ground, stone, level it out, grade it out, form it, pour it, fall away from the house like I said eighth to a quarter inch away from the house, repour it."  DiMuzio estimated the removal of the defective patio and replacing it will cost $9,975.  (Trial Tr. 12-18.)  He said the cause of the incorrect slope toward the house was likely either the installer's failure to correctly compact the underlying soil or improperly pouring the concrete.  (Trial Tr. 22-23.)

**{¶9}**  Charter Oaks had Michael Hreno testify on its behalf.  Hreno is a member and owner of Charter Oaks Development, Limited.  He prepared the Tancer construction

agreement for the construction of their home and was the general contractor overseeing the home construction. Hreno employed the concrete and masonry concrete contractors to install the patio. Hreno agrees the patio slopes toward the house in one area. Hreno stated they backfilled under the patio but did not get the desired result. (Trial Tr. 35-36.)

**{¶10}** On direct, Hreno said the patio was installed in 2020, and the concrete had since settled toward the home because of the soil conditions. Hreno recalled the soil conditions in that area were sandy. He said the dirt wall repeatedly caved toward the basement during construction. He also explained how they backfilled the area with gravel, and tamped the area to compact it before forming the patio. He said they "poured it with wire mesh." (Trial Tr. 52-54.)

**{¶11}** Hreno said the patio was capable of being repaired. He explained how it could be leveled with foam underneath the pad that would both raise the level of the pad and support it. Hreno said this repair would cost about $1,000. Hreno said the patio does not have any cracks in it.

**{¶12}** Linus Orr testified for the Tancers. He was a home inspector at the time. He inspected the Tancer home. He noted in part that the patio had a negative slope toward the foundation that could cause runoff water to end up in the basement. He found it was defective and in need of immediate repair. Orr did not think leveling with the foam injection was the best option since it was a brand new patio. (Trial Tr. 72-80.)

**{¶13}** Regarding the French doors, Orr testified the threshold had a considerable rise to it, which could continue to rise. It would likely lead to problems with opening and closing the door. He also said it may pose a tripping hazard. He concluded the doors were not properly installed since they were not plumb. He advised the Tancers to hire a reputable carpenter to have the doors repaired. Orr agreed that the doors worked by opening, closing, and locking at the time of his inspection. He believed the threshold needed repaired and recalled the doors did not appear to be damaged, but suggested a reputable carpenter was needed to make that determination. (Trial Tr. 81-90.)

**{¶14}** Donald Tancer testified on behalf of the Tancers. He owns a home construction company in Cincinnati. He is the stepbrother of Dan Tancer, one of the Appellees. Donald examined the home and testified about his concerns with the construction.

{¶15} Donald said the French doors in the kitchen did not open and close properly due to a hump in the middle of the threshold. He opined the hump in the floor is either from settlement or improper installation. He said there is a "five-eighths hump in the middle" of the threshold that interferes with the proper operation of the doors. To resolve the issue, Donald would remove the doors and replace them after leveling, which would require removal of the trim, siding, and then replacing the doors. He could not say for certain whether the doors had to be replaced. He said whether the doors had to be replaced is "one of those things that you would have to do it and see if you could get it to work." Thus, he could not say for certain whether he could use the existing doors. Donald's quote for replacing the existing door and correcting the opening was $9,500. (Trial Tr. 97.)

{¶16} On cross-examination, Donald agreed that his quoted price used Anderson brand French doors, which are more expensive than the doors used in the Tancer home. Donald agreed re-installing the doors could be an option. His estimate including the replacement of the French doors was $9,500. Donald said at the time of his estimate, the door he was using for pricing was about $3,500, "which at this point has gone up more." Using the same doors, he said the repair would cost approximately $2,000 or $2,500 total. (Trial Tr. 104-105.)

{¶17} Daniel Tancer testified on his own behalf. He works for a railroad company in the bridge and concrete construction division. He also has a side business doing excavation work. He has dug foundations, installed driveways, and has installed pipelines. (Trial Tr. 108-109.)

{¶18} Daniel cleared the lot where the home was built. Daniel also dug the pond located on the property. He installed a 120-inch diameter, 40-foot long culvert pipe under the driveway of his new home. He said the soil there was predominantly clay. He said there could be layers of sandy soil "here and there" but not much of it. (Trial Tr. 109-110.)

{¶19} On cross-examination, Daniel agreed that Hreno was very responsive to his concerns about the house. They spoke via phone and text.

{¶20} The Tancers also provided the testimony of local counsel, who reviewed the statement for attorney's fees submitted by the Tancers incurred in pursuit of their claims.

This attorney testified that the charges were reasonable and appropriate for a case of this nature.

{¶21} Following trial, the Tancers filed a brief summarizing the testimony in support of their claims and reiterating the relief and damages they were requesting. (December 3, 2024 Trial Brief.) Charter Oaks also filed a post-trial brief.

{¶22} The magistrate ruled in favor of the Tancers on two construction issues. He concluded Charter Oaks breached the parties' agreement by negligently installing the French doors. The court found Charter Oaks failed to install the doors in a workmanlike manner. The court awarded the Tancers damages in the amount of $8,500 for the French doors. The magistrate also concluded Charter Oaks was negligent and breached the contract by failing to properly install the patio in a workmanlike manner. The court awarded the Tancers $9,975 to replace the patio. (February 6, 2025 Magistrate's Decision.)

{¶23} Additionally, the magistrate found the Tancers were entitled to an award of attorney's fees in the amount of $12,869.25, for a total damages award of $31,344.25. The magistrate rejected Charter Oaks' argument that the Tancers were required to show a knowing violation of the Ohio Construction Services Supplies Act for an award of attorney's fees. Instead, the trial court found that its conclusion that Charter Oaks was negligent was sufficient to support an award of attorney's fees. (February 6, 2025 Magistrate's Decision.)

{¶24} Charter Oaks objected to the magistrate's decision. It generally objected to the award of attorney's fees. It also objected to the amount of damages awarded for the French doors and the cement patio. Charter Oaks relied in part on Donald Tancer's testimony that the cost of Therma-Tru doors actually used in the home would be less expensive than the Anderson doors he had quoted. It also argued the Tancers should have only been awarded $2,500, which corresponded with the amount quoted to re-install the doors. (February 18, 2025 Objections.) Charter Oaks' supplemental objections directed the court to hearing testimony in support of its prior objections. Donald Tancer testified in part that the Anderson doors, which he included in the quote, are more expensive than the Therma-Tru brand. It also presented further argument against the award of attorney's fees. (February 27, 2025 Supplemental Objections.)

Case No. 25 MA 0051

**{¶25}** The trial court overruled the objections and adopted the magistrate's decision. The court found in part: "Since the Tancers alleged that Charter Oaks was negligent, this Court finds that the Tancers were not required to prove that Charter Oaks knowingly committed an act or practice in violation of R.C. 4722 in order to be awarded attorney's fees." (May 12, 2025 Judgment.)

**{¶26}** Charter Oaks raises two assignments of error on appeal.

Assignments of Error

**{¶27}** Charter Oaks' first assignment of error asserts:

"The Trial Court erred in the awarding attorney fees in the amount of $12,869.25. There was not evidence that Appellant knowingly committed an act or practice that violated the Ohio Construction Services Supplies Act."

**{¶28}** Charter Oaks' argument is two-fold. First, it contends the trial court erroneously applied the attorney fee provision in the Ohio Construction Services Supplies Act (OCSSA) and that no other grounds existed for the award of attorney's fees in this case. Second, Charter Oaks contends that upon correctly applying the OCSSA, the evidence does not support an award of attorney's fees.

**{¶29}** The Tancers counter that the OCSSA is a remedial act intended to provide homeowners remedies for substandard work and its provisions should be liberally construed. The Tancers contend they established certain work was negligently performed and below the applicable standards, and as such, an award of attorney's fees in their favor was appropriate. The Tancers assert the recovery of attorney's fees under R.C. 4722.08 is permissible upon a finding that the home construction service supplier failed to perform the services in a workmanlike manner. We disagree.

**{¶30}** "A question of statutory construction presents an issue of law that we determine de novo on appeal." *Lang v. Dir., Ohio Dept. of Job & Family Servs.*, 2012-Ohio-5366, ¶ 12. We review the statute to determine if its meaning is clear, and if the legislature's intent is evident, we must give effect to the unambiguously expressed intent. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-843 (1984). "Where the language of a statute is plain and unambiguous and conveys a clear and definite meaning there is no occasion for resorting to rules of statutory interpretation.

An unambiguous statute is to be applied, not interpreted." *Sears v. Weimer*, 143 Ohio St. 312 (1944), paragraph five of the syllabus.

**{¶31}** Absent an ambiguity, "we will apply the statute as written and conduct no further investigation." *State v. Hurd*, 89 Ohio St.3d 616 (2000), citing *State ex rel. Herman v. Klopfleisch*, 72 Ohio St.3d 581, 584 (1995).

**{¶32}** The OCSSA, as set forth in Chapter 4722 of the Ohio Revised Code, was enacted in 2012. At the same time, the legislature amended Ohio's Consumer's Sales Practices Act and eliminated its application from certain home construction contracts.

**{¶33}** The OCSSA is a remedial law designed to provide remedies for owners, and it should be liberally construed pursuant to R.C. 1.11, which states in part, "[r]emedial laws and all proceedings under them shall be liberally construed in order to promote their object and assist the parties in obtaining justice." *See Einhorn v. Ford Motor Co.*, 48 Ohio St.3d 27, 29 (1990) (applying Ohio's Consumer Sales Practices Act (CSPA)).

**{¶34}** "Words and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." R.C. 1.42.

**{¶35}** "'Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument.' *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph two of the syllabus." *King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208, 212 (1988). "In enacting a statute, it is presumed . . . [t]he entire statute is intended to be effective[, and a] just and reasonable result is intended." R.C. 1.47(B) and (C).

**{¶36}** "All provisions of the Revised Code bearing upon the same subject matter should be construed harmoniously. This court in the interpretation of related and co-existing statutes must harmonize and give full application to all such statutes unless they are irreconcilable and in hopeless conflict." *West v. Bode*, 2019-Ohio-4092, ¶ 45, (7th Dist.), *aff'd,* 2020-Ohio-5473, quoting *State v. Cook*, 2010-Ohio-6305.

**{¶37}** R.C. 4722.03(A), Prohibitions, provides:

(A) No home construction service supplier shall do any of the following: . . .

(3) After entering into a contract with an owner, do any of the following: . . .

(d) *Fail to perform the home construction service in a workmanlike manner.*

(Emphasis added.)

**{¶38}** R.C. 4722.01(G) defines workmanlike manner and states: "'Workmanlike manner' means the home construction service supplier has engaged in construction that meets or exceeds the minimum quantifiable standards promulgated by the Ohio home builders association." Thus, performing in an unworkmanlike manner is when a supplier engages in construction that does not meet or exceed the minimum applicable standards.

**{¶39}** R.C. 4722.08 sets forth the remedies available to the owner of a dwelling, and states in part:

(D) The court may award to the prevailing party a reasonable attorney's fee limited to the work reasonably performed, if either of the following apply:

. . .

(2) The home construction service supplier has *knowingly committed an act or practice that violates this chapter.* . . .

(F) Nothing in this section shall preclude an owner from also proceeding with a cause of action under any other theory of law.

(Emphasis added.)

**{¶40}** The legislature adopted the mens rea requirement in R.C. 4722.08 of "knowingly" for the recovery of attorney's fees in connection with a claim that applies to the failure to perform in a workmanlike manner.

**{¶41}** Applying the chapter as a whole, to recover attorney's fees, a court must find the home construction services supplier "knowingly" failed to perform the home construction service in a workmanlike manner. The two provisions must be construed together, and we must apply the plain language of each and give each term meaning. *Santos v. Buckeye 5, LLC*, 2023-Ohio-3602, ¶ 38 (7th Dist.).

**{¶42}** While a trial court has discretion to award attorney's fees, it can only do so upon finding the supplier "knowingly" committed the act in violation of the OCSSA. *See Cartwright v. Beverly Hills Floors*, 2013-Ohio-2266, ¶ 41-42 (7th Dist.) (applying Ohio's CSPA).

**{¶43}** To the extent the trial court found it need not apply the knowingly element, we find error. This conclusion is contrary to a plain reading of the provision. Thus, pursuant to R.C. 4722.08(D)(2), a trial court may award an owner reasonable attorney fees when the supplier intentionally committed an act or practice in violation of the OCSSA. See *Einhorn v. Ford Motor Co.*, 48 Ohio St.3d 27, 30 (1990) (applying Ohio's CSPA). "Knowingly" committing an act or practice in this regard "means that the supplier need only intentionally do the act that violates the . . . Act. The supplier does not have to know that his conduct violates the law for the court to grant attorney fees." *Id.*

**{¶44}** However, the failure to perform in a workmanlike manner generally encompasses work performed in a negligent manner. It is elementary that negligence is a lower threshold than knowingly. According to the trial court as factfinder, the Tancers established the lack of workmanlike conduct in connection with the services Charter Oaks provided relative to the cement patio and the installation of the French doors. These conclusions are not challenged.

**{¶45}** R.C. 1345.01(E) defines "knowledge" as "actual awareness, but such actual awareness may be inferred where objective manifestations indicate that the individual involved acted with such awareness." Thus, to award attorney's fees under the two provisions, when read as a whole, there must be some evidence tending to show the supplier knew his work or conduct fell below the standard of care or did not meet or exceed applicable standards.

**{¶46}** The Ninth District Court of Appeals has held that "[a]cting 'intentionally' means 'to do something purposely, and not accidently.'" *Crow v. Fred Martin Motor Co.*, 2003-Ohio-1293, ¶ 44 (9th Dist.) (applying Ohio's CSPA), quoting *Black's Law Dictionary* 810 (6th Ed. 1990). Thus, an owner must establish some fact upon which awareness may be inferred to demonstrate a knowing violation. *Id*. For example, evidence tending to show the cement was poured incorrectly with no effort to remedy the issue could tend to show a knowing failure to perform the construction in a workmanlike manner. Or evidence tending to show Charter Oaks hired an unqualified subcontractor or someone unqualified to perform certain work could tend to show Charter Oaks knowingly failed to perform in a workmanlike manner.

**{¶47}** Thus, because the trial court found an award of attorney's fees was permissible under the OCSSA without finding a knowing violation, we find an error of law. Based on the arguments and evidence before it, the trial court was required to find that Charter Oaks knowingly failed to perform its contracted services in a workmanlike manner before awarding attorney's fees. Accordingly, we reverse, remand and order the trial court to vacate the award of attorney's fees.

**{¶48}** We note that a prevailing party in a civil action is generally not entitled to recover attorney's fees, absent a statute or contract providing for the losing party to pay. *Wildcat Drilling, LLC v. Discovery Oil & Gas, LLC*, 2025-Ohio-1175, ¶ 73 (7th Dist.), citing *Wilborn v. Bank One Corp.*, 2009-Ohio-306, ¶ 7.

**{¶49}** The first aspect of the Tancers' first assigned error has merit.

**{¶50}** As for Charter Oaks' second contention under this assignment of error, i.e., that upon correctly applying the OCSSA, the evidence does not support an award of attorney's fees, we decline to reach the merits of this issue for the first time on appeal.

**{¶51}** As an appellate court, our review is limited to the issues actually decided by the trial court. *Lycan v. Cleveland*, 2016-Ohio-422, ¶ 21 (reversing the Eighth Appellate District's decision addressing res judicata on the merits for the first time on appeal); *Tree of Life Church v. Agnew,* 2014-Ohio-878, ¶ 27-28 (7th Dist.) (declining to consider the merits of summary judgment arguments not raised to the trial court); *Gonzales v. Perez*, 2015-Ohio-1282, ¶ 17 (7th Dist.) (declining to address argument raised for the first time on appeal.)

**{¶52}** Because the trial court has not yet assessed whether the facts in evidence support such a finding, we decline to do so for the first time on appeal. Before attorney fees can be awarded under OCSSA, the trial would have to find Charter Oaks knowing failed to perform its contracted services in a workmanlike manner on remand.

**{¶53}** The Tancers' second assignment of error contends:

"The Trial Court erred in awarding damages in the amount of $8,500.00 for the French Doors."

**{¶54}** Charter Oaks first argues the trial court erred by awarding the cost to replace the doors when the evidence showed the doors were capable of being repaired. Charter Oaks contends there was no evidence showing the doors were defective, and as

such, the award should have been limited to the amount to remove and reinstall the existing doors, i.e., $3,500.

**{¶55}** Second, assuming the doors needed replaced, Charter Oaks asserts the court also erred by granting an $8,500 award. It contends this was the price quoted to replace the existing doors with Anderson brand French doors, which are more expensive than the Therma-Tru doors installed and priced in the parties' contract. For the following reasons, both aspects of this assignment of error lack merit.

**{¶56}** When reviewing civil appeals from bench trials, an appellate court applies a manifest weight standard of review. *St. Clairsville Pointe, Inc. v. Musilli*, 2022-Ohio-2646, ¶ 47 (7th Dist.); App.R. 12(C); *Seasons Coal v. Cleveland*, 10 Ohio St.3d 77 (1984).

**{¶57}** A weight of the evidence argument challenges the believability of the evidence and requires a reviewing court to address the competing inferences suggested by the evidence. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. An appellate court may not substitute its view for that of the trier of fact. We must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the factfinder clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed, and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

**{¶58}** The Tancers assert this aspect of the damage award was supported by the evidence, and there was no evidence offered to the contrary that would have allowed the court to award a lower amount. The Tancers direct us to the testimony of Donald Tancer who provided an estimate of $9,500 to replace the doors and for $3,500 if the doors do not need replaced, but only repaired. They claim the French doors he quoted for replacement cost $3,500. The Tancers also argue that if Charter Oaks disagreed with their evidence as to the cost to replace the French doors, then the onus to come forward with such evidence was on Charter Oaks. Hreno testified on behalf of Charter Oaks, but he did not testify as to the value of the doors or the cost to repair or replace them.

**{¶59}** The trial court found Charter Oaks was negligent regarding the installation of the French doors, and the Tancers were damaged in the amount of $8,500.

{¶60} As detailed in the Statement of the Case, both Orr and Donald Tancer testified the French doors were improperly installed. Orr testified the doors were not level and that a carpenter should be consulted to assess the extent of the necessary repair.

{¶61} Donald testified there was a considerable hump in the threshold. He believed the doors needed removed to level the rise. He estimated the cost to repair ranged from $9,500 if the doors needed replaced in the repair process or $2,500 if the doors were capable of being re-used and reinstalled without damage during the process. The Tancers acknowledged in their trial brief that Therma-Tru doors would be "a couple of $1,000 cheaper."

{¶62} On cross-examination, Donald explained that whether the doors could be reused was not something he could state with certainty until the repair was actually performed. Donald agreed his quote to replace the French doors included the cost to replace the existing doors with Anderson brand doors, which are more expensive than the Therma-Tru brand installed and encompassed by the parties' contract. No definitive price differential was established at trial between the Anderson brand and Therma-Tru French doors. It appears the trial court discounted the quoted $9,500 by $1,000 in light of Donald's testimony that the brand he quoted are more expensive than the installed brand.

{¶63} Charter Oaks called Cody McClelland to testify. He is a manufacturing representative for Therma-Tru doors. He explained that doors installed as part of new home construction often need adjusted after installation. Sometimes more than one adjustment is required. McClelland testified that Anderson doors are generally more expensive than Therma-Tru doors. However, he could not testify as to the cost to purchase or replace the French doors in the Tancers' home since price depends on finishes and other variables.

{¶64} First, we conclude the trial court did not err by not awarding only the cost to reinstall the French doors. There was no evidence showing the doors were capable of being removed and reinstalled without damage. Although Donald stated it was possible the doors could be reused, he also said whether the doors could be reinstalled without damage would not be ascertainable until they were actually removed and reinstalled. Thus, this aspect of the second assigned error lacks merit.

Case No. 25 MA 0051

**{¶65}** As far as the cost of replacing the doors, we cannot conclude the trial court's award of $8,500 to replace the French doors is against the manifest weight of the evidence. Donald testified it would cost $9,500 to remove the existing doors, trim, and siding and to replace it all. However, he also acknowledged his quote included a more expensive brand of doors. The trial court evidently discounted his quote by $1,000 consistent with Donald's testimony. Thus, we cannot conclude the factfinder clearly lost its way and created a manifest miscarriage of justice such that its judgment must be reversed.

**{¶66}** In light of the foregoing, Charter Oaks' second assigned error lacks merit in its entirety.

## Conclusion

**{¶67}** For the foregoing reasons, Charter Oaks' first assigned error has merit in part. To the extent the trial court awarded the Tancers attorney's fees, we find error, reverse and remand. We order the award of attorney's fees in the Tancers' favor in the amount of $12,869.25 vacated. On remand, the trial court would have to find Charter Oaks knowingly failed to perform its contracted services in a workmanlike manner before awarding attorney's fees under the OCSSA.

**{¶68}** Because Charter Oaks' second assigned error lacks merit, the remainder of the trial court's judgment is affirmed.

**{¶69}** The trial court's judgment is affirmed in part, reversed in part, and remanded.


Hanni, J., concurs.

Dickey, J., concurs.


Case No. 25 MA 0051

_____

For the reasons stated in the Opinion rendered herein, it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed in part and reversed in part. We hereby remand this matter to the trial court for further proceedings according to law and consistent with this Court's Opinion. Costs to be taxed against the Appellees.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**